## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 28 2015, 6:36 am

CLERK
of the supreme court,
court of appeals and
tax court

---

ATTORNEY FOR APPELLANT

Rae Feller
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Sean C. Lemieux
Lemieux Law
Indianapolis, Indiana

---

# IN THE
# COURT OF APPEALS OF INDIANA

---

In the Matter of the Paternity of B.K. and L.K.,

Kathryn D. McCallaham,

*Appellant-Petitioner,*

v.

Joy X. Khotxay,

*Appellee-Respondent.*

May 28, 2015

Court of Appeals Case No. 49A04-1407-JP-345

Appeal from the
Marion Circuit Court

The Honorable Louis Rosenberg, Judge
The Honorable Sheryl Lynch, Commissioner

Cause No. 49C01-0910-JP-47650

**Kirsch, Judge.**

[1]     Kathryn D. McCallaham ("Mother")[1] appeals the trial court's order modifying custody to grant sole physical custody to Joy X. Khotxay ("Father") and ordering the parents to share joint legal custody. Mother raises one issue for our review, which is whether the trial court abused its discretion when it modified custody.

[2]     We affirm.

## Facts and Procedural History

[3]     Mother and Father, who were never married, are the parents of two children, B.K., born October 26, 2001, and L.K., born October 3, 2003. The parents were in a relationship and lived together until 2006 when Mother moved out of the residence. At that time, Mother requested that Father have physical custody of the children so she could get back on her feet. Thereafter, Father had physical custody of the children until 2009. Paternity of the children was formally established by the trial court in December 2009, and the parties agreed that Mother would have physical and legal custody of the children, while Father would have parenting time.

[4]     Subsequent to the agreed order, Father exercised parenting time with the children from Friday to Monday every week. In 2010, Mother changed Father's parenting time to Saturday to Tuesday every week. In 2012, when

---

[1] We note that Mother's name appears as both "Kathryn D. McCallaham" and "Kathryn D. McCallahan" in various places in the record. Per a motion filed with this court and an order issued by this court, the correct spelling is "McCallaham," and we shall use that spelling in referring to Mother.

Father moved in with his current wife, Mother again changed his parenting time to alternate between Friday and Saturday one week and Sunday and Monday the next week. Father married his current wife in 2012, and they have a baby together; his wife also has a son from a prior marriage, whose parenting time she arranges so that all four children can be together.

[5] In August 2012, Mother filed her petition to modify child support. A month later, in September, Father filed his petition to modify custody, child support, and parenting time and a motion for rule to show cause. Hearings on these cross-motions were held on November 13, 2013, March 11, 2014, and March 12, 2014.

[6] At the hearings, evidence was presented that the children's educational needs had changed, and Father believed he should be awarded primary physical custody because he could provide a consistent schedule. B.K. is generally a good student, but struggled with reading and comprehension. L.K., however, particularly struggles with academics. In the second grade, L.K. had been a B-C student, but began failing his classes in the third grade. Father testified that when he tried to speak with Mother about work that needed to be done to help L.K., she would not respond to Father. *Tr.* at 74. L.K.'s third grade teacher, Ms. Steiner, notified the parents that L.K. was habitually failing to turn in his homework, and Father worked with her to make sure the homework was getting completed. During Father's parenting time, Father would initial L.K.'s homework when it was completed, initial the reading log, and sought other interventions to assist L.K. Mother did not initial L.K.'s homework and did

not follow up with Ms. Steiner. Mother said that her live-in boyfriend checked L.K.'s homework when he was with Mother, and on the weekends, she did not regularly check L.K.'s backpack for homework due on Monday; instead Mother thought the teachers would contact her if there was homework assigned over the weekend. *Id*. at 472.

[7] During the third grade, which was the 2012-2013 school year, L.K. would receive a homework packet on Mondays to be completed and turned in each Friday. When Father had parenting time on Wednesdays evenings, he would check L.K.'s backpack and find the packets had not yet been started. When he asked Mother about the packets, she would respond that she did not know about them and did not check L.K.'s backpack. She also testified that she had never seen the reading log that L.K. was required to keep and the parents were required to sign. *Id*. at 363. During Christmas break of 2012, L.K. received a packet of schoolwork to complete over the break, but Mother did not "make him do an entire ten page packet" because it was a break. *Id*. at 473. She stated, instead, he read and did "other things," but did not "make him sit in front of a piece of paper" on his break. *Id*. When questioned as to why she did not make it a priority to have L.K. complete the packet, especially in light of L.K.'s struggles in school, Mother testified, "There is no answer for that. I don't know how to answer that." *Id*. at 473-74.

[8] Mother did not do extra work with L.K. to help him improve his grades, and when asked why, she did not have an answer. Father purchased additional educational materials, including reading and writing workbooks, to assist the

children with their schoolwork. L.K. also attended tutoring sessions at Sylvan Learning Center. Mother cancelled seven of the appointments, which were later made up, but Father was worried about the cancellations because of the lack of consistency it created.

[9] Although B.K. does not have academic struggles to the same extent as L.K., B.K. does struggle with reading and comprehension. Mother did not have B.K. do any additional reading to help him improve, and she testified that she did not know why she did not do so. *Id*. at 364-65. Father helps B.K. with his homework when he helps L.K., and also has B.K. read thirty minutes a day and write a summary of the reading.

[10] In 2012, L.K.'s teacher voiced her concern to Mother and Father that L.K. may have ADHD. Father wished to have L.K. see a doctor for a diagnosis and treatment and, for approximately two years, requested that Mother take L.K. to the doctor as she had sole legal custody of the children. However, Mother refused to do so because she did not want him to be labeled for life and because she was worried the medication would turn L.K. into a zombie. Instead, Mother self-prescribed Vitamin E and added fish and protein to his diet. When L.K. was taken to the doctor in early 2014 and after the first hearing date in November 2013, L.K. was diagnosed as having ADHD and prescribed medication. Since starting the medication, L.K. is more focused, but more emotional and cries more often.

Mother failed to keep L.K.'s vaccinations up to date, and he was sent home from school as a result. Father took L.K. to get the vaccination so he could return to school. There was an incident when L.K. tore his fingernail during a skateboarding accident while in Father's care. Father contacted urgent care, treated the injury as directed, and contacted Mother to tell her of the injury. Mother called the police because Father did not take L.K. to the emergency room. When the police arrived, the responding officer told Father to call Mother to have her come look at L.K.'s finger, but Mother did not answer her phone when Father called. Additionally, the children's pediatrician recommended that they go to bed before 9:00 p.m., and therefore, Father changed their bedtime when they stayed with him to 8:30 p.m. However, when the children were with Mother, Father would often receive test messages from them later than 9:00 p.m. Mother would also try to contact the children after 9:00 p.m. when they were staying the Father.

Following the hearing of the parents' cross-petitions, the trial court entered its order on June 30, 2014 and concluded:

> 52. Father is in a better position to provide for the children with stability residentially and educationally given the evidence presented at the three day trial.
>
> . . . .
>
> 54. Again, Father is in a better position to provide for the children educationally and provide a stable home. This is in the best interests of the children.
>
> 55. The Court finds there has been a substantial change in circumstances in the primary physical custody factors enumerated in I.C. 31-14-13-2 given the evidence, with emphasis on the children's

home, school and community to warrant a modification of custody which is in the children's best interest.

56.  Father shall have primary physical custody of the children effective the week before the children start their school year for 2014-2105. . . .

. . . .

60.  Mother and Father have very different parenting styles.  These children need as much consistency in their home environment as possible to succeed in life as young teenagers and adults.  Father has demonstrated he can provide that consistency in his home.  Mother did not show the Court that she could provide that consistency in her home environment to possibly thrive and nourish the children to succeed.

61.  In fact, Mother's evidence demonstrated to the Court that she is doing the bare minimum to get the children to thrive and be successful in school.

*Appellant's App*. at 11-13.  The trial court, therefore, ordered custody to be modified to reflect that Father have primary physical custody and for Mother and Father to share joint legal custody.  Mother now appeals.

## Discussion and Decision

When reviewing a custody determination, we afford the trial court considerable deference as it is the trial court that observes the parties' conduct and demeanor and hears their testimonies.  *In re Paternity of C.S.*, 964 N.E.2d 879, 883 (Ind. Ct. App. 2012) (citing *Kondamuri v. Kondamuri,* 852 N.E.2d 939, 945-46 (Ind. Ct. App. 2006)), *trans. denied*.  Custody modification lies within the sound discretion of the trial court, and the decision will be reversed only upon a showing of manifest abuse of discretion.  *L.C. v. T.M.*, 996 N.E.2d 403, 407 (Ind. Ct. App. 2013) (citing *Fields v. Fields,* 749 N.E.2d 100, 107-08 (Ind. Ct.

App. 2001), *trans. denied*). Such an abuse occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Id*. We will neither judge the credibility of witnesses nor reweigh the evidence. *Id.* "[I]t is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by the appellant before there is a basis for reversal." *Kirk v. Kirk,* 770 N.E.2d 304, 307 (Ind. 2002) (quoting *Brickley v. Brickley,* 247 Ind. 201, 210 N.E.2d 850, 852 (1965)).

[14] When the trial court enters special findings of fact and conclusions based on those findings pursuant to Indiana Trial Rule 52(A), we apply a two-tiered standard of review: whether the evidence supports the findings and whether the findings support the order. *In re C.S.*, 964 N.E.2d at 883 (citing *Tompa v. Tompa,* 867 N.E.2d 158, 163 (Ind. Ct. App. 2007)). The trial court in this case entered findings of fact and conclusions sua sponte. In such cases, the specific findings control only with respect to the issues they cover, while a general judgment standard applies to issues outside the court's findings. *In re Marriage of Sutton,* 16 N.E.3d 481, 484-85 (Ind. Ct. App. 2014). We will set aside a trial court's findings or judgment only if they are clearly erroneous. *Id*. at 485. A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *Id.*

[15] Mother argues that the trial court erred in its decision to modify custody. She specifically contends that the trial court erred because there was no substantial change in the statutory circumstances that would justify custody modification.

Mother asserts that, although the trial court found that Father was in a better position to provide for the children educationally and to provide a stable home, there was no evidence that Mother was unstable or that her life had changed substantially since she and Father split up in 2006. She further claims that she too has a stable home and can offer the children stability as she has done their entire lives.

[16] In Indiana, a trial court may not modify custody in a paternity action unless: (1) the modification is in the best interests of the child; and (2) there is a substantial change in one or more statutory factors contain in Indiana Code section 31-14-13-2. Ind. Code § 31-14-13-6. The factors the trial court shall consider in its determination of custody include:

> (1) the age and sex of the child
>
> (2) the wishes of the child's parents
>
> (3) the wishes of the child, with more consideration given to child's wishes if child is fourteen years old or older
>
> (4) the interaction and interrelationship of the child with the parents, siblings, and any other person who may significantly affect the child's best interest
>
> (5) the child's adjustment to home, school, and community
>
> (6) the mental and physical health of all individuals involved
>
> (7) evidence of a pattern of domestic or family violence by either parent
>
> (8) evidence that the child has been cared for by a de facto guardian

Ind. Code § 31-14-13-2. A substantial change in any one of the statutory factors will be sufficient to support a modification in custody. *See* I.C. § 31-14-13-2.

[17] Here, the trial court found that modification was in the best interests of the children and that there had been a substantial change in the circumstances of the children's home, school, and community. The evidence presented showed that L.K. struggled academically and began failing his classes in the third grade. The evidence also showed that, although B.K. was generally a good student, he struggled with reading and comprehension. When the children were in Father's care, he proactively worked with the children on their school work by ensuring that L.K.'s homework was completed and initialing it when completed, by making the children do extra work in supplemental workbooks he purchased, and requiring them to do extra reading and write summaries on what they read. Father also kept in close contact with the children's teachers and regularly checked their backpacks for homework when the children were in his care. L.K. received homework packets each Monday that were due at the end of the week, and when Father had the children on Wednesdays, he would find the packets in L.K.'s backpack and not yet started. Although Father regularly signed the children's reading logs, Mother stated she had never seen the reading log that the school required L.K. to keep. On Mother's weekends with the children, she did not generally check for homework due on Mondays, and instead believed the teachers would call her if homework was assigned.

[18] This evidence sufficiently demonstrates a substantial change in the children's academic abilities and needs had occurred. The evidence also shows that Father is more dedicated to the children's academic success than Mother as he actively works with the children and ensures that they complete their

homework and complete extra work to improve academically. The evidence showed that Mother did not do such things and did not have answers as to why not.

[19] Additionally, the evidence showed that the evidence presented demonstrated that, as the children have grown, their health needs have changed. For approximately two years prior to the hearings in this case, Father had requested that Mother have L.K. taken to a doctor for a possible diagnosis and treatment for ADHD after his teacher had voiced concerns. Despite L.K.'s academic struggles, Mother delayed taking L.K. until January 2014, which was after the first evidentiary hearing in this case. Additionally, the children's doctor recommended that the children go to bed before 9:00 p.m., and therefore, Father instituted an 8:30 p.m. bedtime when the children stayed with him. However, when they stayed with Mother, he would often receive text messages from the children after 9:00 p.m., and Mother would attempt to contact the children later than 9:00 p.m. when they were at Father's house. The evidence presented demonstrated that a substantial change in the children's health needs had occurred.

[20] While there was sufficient evidence to show that there had been a substantial change in the children's academic needs, we also find that there was ample evidence that the children's health needs had changed substantially, and that modification of custody was in the best interests of the children. We, therefore, find that that trial court's conclusions that modification of custody was in the best interest of the children and that a substantial change in the children's

home, school, and community had occurred were not clearly against the logic and effect of the facts and circumstances before the trial court. The trial court's decision to modify custody was not an abuse of discretion. Mother's arguments to the contrary are merely requests for this court to reweigh the evidence, which we cannot do. *L.C.*, 996 N.E.2d at 407.

[21] Affirmed.

Vaidik, C.J., and Bradford, J., concur.